# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6944 | **DATE** | 8/19/2003 |
| **CASE TITLE** | Wilson vs. Sundstrand | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)■ [Other docket entry] For reasons set forth in the Memorandum Opinion and Order, motion for summary judgment as to plaintiffs' strict liability claims (Counts 1 & 2 of first amended complaint in this case). The Court grants plaintiffs' motion for summary judgment as to affirmative defenses four through fourteen but otherwise denies that motion (191). Motion for an order deeming certain fact admitted as a sanction for improper conduct of defendant's counsel at deposition and motion for an order deeming certain fact admitted as a sanction for improper conduct of defendant's counsel are granted in part (265,266). Defendant's motion for costs and attorney's fees is denied (204).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | AUG 22 2003 | |
| | Notices mailed by judge's staff. | | date docketed | |
| | Notified counsel by telephone. | | | 286 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

03 AUG 21 PM 4:01

Date/time received in
central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AUG 2 2 2003

LYNDA WILSON, et al., and )
HERRY RASYIDIN HARAHAP, et al., )
                         )
         Plaintiffs, )
                         )       Case Nos. 99 C 6944
     vs. )        and  99 C 6946
                         )
SUNDSTRAND CORP., )
                         )
         Defendants. )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

These consolidated actions, which involve the crash of a Garuda Indonesia airliner in
Indonesia in September 26, 1997, are set for trial in late September 2003. The case had
originally been set for trial in late March 2003, but trial was deferred for six months at the
request of both parties so that they could attempt to settle it. At that time, a number of pending
motions were withdrawn and were therefore terminated by the Court with the understanding that
they would be revived if the effort at settlement did not succeed. In late July, the parties advised
the Court that they had not settled the case. Briefing on certain of the motions has now been
completed. In this order, the Court rules on those motions.

## 1.     Defendant's motion for summary judgment on strict liability claims

The plaintiffs' claims against Sundstrand arise from their contention that the aircraft's
ground proximity warning system, which they say was manufactured by Sundstrand, was
defective, failed, and caused the crash. Plaintiffs have asserted claims of negligence and strict

286

liability in tort. Sundstrand has moved for summary judgment on the strict liability claims based an Illinois statute which provides as follows:

> [N]o product liability action based on the doctrine of strict liability in tort shall be commenced except within the applicable limitations and, in any event, within twelve years from the date of the first sale, lease or delivery of possession by a seller . . . of any product unit that is claimed to have injured or damaged the plaintiff, unless the defendant expressly has warranted or promised the product for a longer period and the action is brought within that period.

735 ILCS 5/13-213(b).[1] Sundstrand disputes that its GPWS was on board the aircraft. It argues, however, that if one believes plaintiffs' evidence purporting to show that a Sundstrand-manufactured GPWS was on the aircraft, that evidence reflects that the GPWS had to have been sold more than twelve years before the crash. Plaintiffs respond that it is incongruous for Sundstrand to take the position that its GPWS was not on the aircraft but nonetheless rely on the contrary proposition in seeking summary judgment. They also argue that there is circumstantial evidence that Sundstrand made an express lifetime warranty for its GPWS.

The Court rejects plaintiffs' argument that it is inappropriate for Sundstrand to base a summary judgment motion on the proposition that its GPWS was on the aircraft when it denies that proposition. The standard for assessing summary judgment motions requires the Court to consider the evidence in the light most favorable to the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). For that reason, it is not at all improper, nor is it uncommon, for a defendant to base a summary judgment on the plaintiff's view of the evidence. Doing so does not require the defendant to concede the evidence's admissibility or to concede for purposes of trial the truth of any of the plaintiff's contentions.

---

[1] Section 13-213(b) admits of certain exceptions, but plaintiffs do not argue that they apply.

Plaintiffs' sole support for the proposition that there was an express lifetime warranty is the affidavit of one of its expert witnesses, Glenn Haskins, presented as an expert in the field of airborne guidance, navigation and control equipment. Haskins states that under Federal Aviation Administration requirements (which he does not identify in his affidavit), "if avionics equipment [of the type at issue] has a finite design life expectancy, it must be incorporated into the maintenance requirements for that equipment. Sundstrand Corporation did not have any design life expectancy criteria for the Mark II ground proximity warning computer incorporated in the maintenance requirements for the GPWS, and this constitutes an express warranty that there is no limitation on its useful life." Haskins Affid. ¶ 4(e).

The final clause of Haskins' statement – that the failure to identify a limitation on the life expectancy of the device – amounts to a legal conclusion that he is not competent to make and one that the Court must assess independently. Plaintiffs have provided the Court with no legal authority supporting the proposition that evidence along the lines indicated by Haskins supports a claim of express warranty under Illinois law (which, in the absence of any contrary indication by the parties, we will assume applies). Under Illinois law, an express warranty exists when the seller makes a positive assertion of fact to assure the prospective buyer of that fact and induce him to make the purchase. *See McAndrews & Forbes Co. v. Mechanical Manufacturing Co.,* 367 Ill. 288, 297, 11 N.E.2d 382, 386 (1937). Although "[n]o particular words or forms of expression are necessary to create an express warranty," *id.,* implicit in the concept of an *express* warranty is that there has to be an *expression* of some sort, and here plaintiffs have referred the Court to none. *See* 810 ILCS 5/2-313(1)(a)-(c) (express warranty is created by an "affirmation of fact or promise made," a "description of the goods," or a "sample or model"); *Weiss v. Rockwell*

3

*Manufacturing Co.,* 9 Ill. App. 3d 906, 914, 293 N.E.2d 375, 381 (1973) ("to be actionable under the theory of express warranty the claim must be based on an affirmation of fact or promise which is not a statement representing the seller's opinion or commendation of the goods"); *cf.* 1 J. White & R. Summers, Uniform Commercial Code § 9-5 at 490 (4th ed. 1995 & Supp. 2003) (discussing *Hill Aircraft & Leasing Corp. v. Simon,* 122 Ga. App. 524, 526-27, 177 S.E.2d 803, 805 (1970), in which the court found that the description of an aircraft as "Aero Commander, N-2677B, Number 135, FAA, Flyable," was an express warranty that the aircraft complied with FAA Regulation Part 135). Again, plaintiffs have not referred the Court to any authority from Illinois or elsewhere that the failure to claim a limited useful life, combined with a federal regulation purportedly providing that any limitations on useful life must be disclosed, constitutes an *express* lifetime warranty.

For these reasons, the Court grants summary judgment in favor of defendant on Counts 1 and 2 of the plaintiffs' second amended complaint in the *Rasyidin* case (99 C 6946) and Counts 1 and 2 of the plaintiffs' first amended complaint in the *Wilson* case (99 C 6944).

**2.     Plaintiffs' renewed motion for summary judgment as to certain affirmative defenses**

Plaintiffs have moved for summary judgment as to Sundstrand's third, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth affirmative defenses on the grounds that Sundstrand has failed to identify any information which supports any of those defenses. The motion is denied as to the third affirmative defense, which relies on the Illinois statutes of limitation and repose.

In its fifth affirmative defense, Sundstrand asserts that plaintiffs have failed to join one or more indispensable parties, though it identifies no such party. In the sixth defense, Sundstrand

asserts that other unnamed persons or entities were the proximate cause of the plaintiffs' injuries. In the seventh defense, Sundstrand alleges that the plaintiffs' injuries were the result of an unavoidable accident. In the eighth defense, Sundstrand asserts that plaintiffs' injuries were the result of negligence or culpable conduct of other unnamed persons. In the ninth defense, Sundstrand alleges that the product at issue complied with the state of the art, industry standards, and applicable regulations. In the tenth defense, Sundstrand alleges that the injuries were caused by an inherent characteristic of the product for which it provided adequate warnings. In the eleventh defense, Sundstrand asserts that at the time the product left its control, there was no practical and feasible alternative design that would have prevented the injuries. In the twelfth defense, Sundstrand asserts that the product was sold to informed buyers and that the accompanying warnings and instructions were sufficient to exculpate Sundstrand from liability. In the thirteenth defense, Sundstrand alleges that plaintiffs' injuries were caused by the unforeseeable misuse or alteration of the products by other unnamed persons.

The first question is whether these are, in fact, "affirmative defenses." The fact that Sundstrand has called them that does not make it so; it is not particularly uncommon for defendants to plead as affirmative defenses allegations that simply state the negative of some proposition on which the plaintiff bears the burden of proof. What exactly constitutes an affirmative defense is left open by the Federal Rules. *See* Fed. R. Civ. P. 8(c); *see generally,* 5 C. Wright & A. Miller, Federal Practice and Procedure §§ 1270-71 (1990 & Supp. 2003). Neither party has given the Court any input on the question whether the matters asserted by Sundstrand are truly affirmative defenses, let alone whether they are matters on which Sundstrand bears the burden of proof. The Court does not intend to do the parties' work for them in this regard and

thus does not address at this time whether the matters asserted by Sundstrand are actually affirmative defenses under applicable law.

To the extent, however, that the matters asserted in the affirmative defenses are in fact issues on which Sundstrand bears the burden of proof, plaintiffs are entitled to summary judgment. *See* Fed. R. Civ. P. 56(a) (plaintiff may seek summary judgment on part of a claim); *id.* 56(d) (permitting the Court to enter what is sometimes referred to as "partial summary judgment"). In their motion, plaintiffs do not attempt to show affirmatively that these "defenses" lack merit. Rather they essentially argue that Sundstrand cannot support any of them. A party may properly seek summary judgment by essentially throwing the ball into the court of the party with the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). When such a motion is made, the non-moving party bearing the burden of proof on the particular issue must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)).

Sundstrand's response to plaintiffs' motion is fourfold. First, Sundstrand argues that the motion is premature. It most decidedly is not. The motion was made at the deadline for filing such motions that the Court had set, which was a little over three months before trial in a case that was three years old at that point. Moreover, contrary to Sundstrand's suggestion, a plaintiff is not required to demonstrate liability, or a prima facie case of liability, before seeking summary determination of an affirmative defense. Sundstrand has cited no authority suggesting that such a rule exists, nor is the Court aware of any.

Second, Sundstrand argues that it has supplemented certain discovery responses to which

6

plaintiffs referred in their motion for summary judgment. This argument misses the point. When a summary judgment motion is made, the opposing party has to show *the Court* its evidence. Its earlier supplementation of discovery responses may clear the way for this, but the fact that unspecified information has been identified in discovery obviously does not defeat a summary judgment motion. In any event, Sundstrand's so-called supplementation of its discovery responses was woefully deficient. Its attorney simply plaintiffs' attorney sent a letter, long after discovery was closed, stating in its entirety as follows:

> Please be advised that Hamilton Sundstrand Corporation hereby amends its prior discovery responses to include the information which has been revealed to all parties during the discovery in this case, including but not limited to the depositions which have recently been taken in England and Washington, the court proceedings in Australia, and the documents produced by those witnesses and in that proceeding.

Dfdt's Resp. to Pltf's Renewed Mot. for SJ, Ex. B. That was neither a proper response to discovery nor a proper supplementation of existing answers. The disclosing party must give enough information to permit the requesting party to identify which disclosed information is responsive to which request. *See, e.g.,* Fed. R. Civ. P. 33(d) (party that answers interrogatory by reference to records must provide sufficient detail to permit opposing party to identify the records from which the answer may be ascertained); *id.* 34(b) (party producing documents must produce them as they are kept in the ordinary course of business or must organize them to correspond with the categories in the request).

Third, Sundstrand argues that its "affirmative defenses" satisfy federal pleading requirements. Again, this misses the point. Plaintiffs are seeking summary judgment on the defenses; they have not moved to strike them for inadequate pleading.

Finally, Sundstrand suggests that information may yet be forthcoming to support certain of the "affirmative defenses." But the time to provide that evidence was *now;* Sundstrand has failed to do so.

For these reasons, to the extent Sundstrand's fifth through fourteenth affirmative defenses are actually affirmative defenses, partial summary judgment under Rule 56(d) is granted in plaintiffs' favor on those affirmative defenses. To the extent they are not actually affirmative defenses, they are stricken.

**3.    Defendant's motion for costs and attorney's fees pursuant to Rule 30(g)**

Sundstrand has moved for an award of attorney's fees and expenses and the expenses of witnesses in connection with the allegedly improper last-minute cancellation of the deposition of Professor Soeryanto (his first name has not been provided), which was to take place in Singapore on October 25, 2002. Soeryanto, an Indonesian resident, was evidently employed by the government of the Republic of Indonesia to investigate the crash at issue in this case.

The deposition of Professor Soeryanto was scheduled following this Court's issuance of letters rogatory directed to the appropriate tribunal in Indonesia. Plaintiffs represent that they provided Soeryanto with a copy of the letters rogatory. It is not clear whether they ever presented the letters rogatory to an Indonesian court. In any event, the parties arranged for the deposition to take place in Singapore due to perceived safety concerns for Americans traveling to Indonesia. Soeryanto agreed to appear in Singapore after learning of the American attorneys' safety concerns. Plaintiffs' counsel scheduled the deposition for a date on which both sides' United States counsel planned to be in Singapore to depose certain plaintiffs. Plaintiffs say that they confirmed and reconfirmed with Soeryanto that he would appear as scheduled.

On October 21, plaintiffs' counsel sent defendant's counsel a letter stating that the deposition would proceed on October 25 as scheduled. Plaintiffs say that on October 24 – after Sundstrand's Indonesian counsel had traveled to Singapore to participate in the deposition – Soeryanto called plaintiffs' attorney and said he would not appear, though he evidently gave no reason for the switch. Plaintiffs contend that Soeryanto also revealed to counsel at that time that in addition to his work for the Indonesian government investigating the crash, he had earned outside income from Garuda as a consultant. Plaintiffs' counsel immediately advised defendant's counsel that Soeryanto would not be appearing on October 25, and they discussed the possibility of traveling to Indonesia; however, both sides agreed that would not be prudent.

Plaintiffs' attorney says that he again made contact with Soeryanto at a later date. Counsel states that Soeryanto advised that he had been visited by Sundstrand's Indonesian counsel, who told Soeryanto that he also represented Garuda. According to plaintiffs' counsel, Soeryanto said that the Indonesian attorney "congratulated" him and said he was pleased that Soeryanto had refused to appear. In response to this allegation, Sundstrand has submitted an affidavit of its Indonesian counsel, Andrew Sriro. He denies the accusation made by plaintiffs and said he played no role in interfering with the deposition or persuading Soeryanto not to appear. Sriro does not deny the assertion that he also represents Garuda.

Sundstrand attributes the cancellation of the deposition to plaintiffs' failure to serve Professor Soeryanto with compulsory process following the issuance of the letters rogatory. It seeks to recover from plaintiffs the attorney's fees, travel and lodging expenses of their Indonesian counsel, which amount to $5,557. Sundstrand does not ask for recovery of the fees or expenses of its United States counsel, as he was already in Singapore to prepare for and take

other depositions in the case.

Rule 30(g) provides that if the party that has noticed a deposition fails to serve a subpoena and the witness does not attend because of that failure, and the other party attends personally or through an attorney expecting the deposition to be taken, the court may order the party giving notice to pay the other party's reasonable expenses, including reasonable attorney's fees. Fed. R. Civ. P. 30(g). Plaintiffs argue that the rule "applies only to parties, not non-parties such as [Sundstrand's] Indonesian counsel," but the Court does not agree; the Rule plainly contemplates the attendance of a party's counsel and permits compensation for counsel's fees and expenses if the Rule's requirements are otherwise met.

Sundstrand contends that whatever the reason for Soeryanto had for not appearing, his non-appearance was attributable to plaintiffs' failure to serve him with compulsory process. That clearly is not the case. The only compulsory process with which Soeryanto, a resident of Indonesia, could have been served was process issued by an Indonesian court compelling him to appear somewhere in Indonesia. But the parties agreed not to take that route and instead chose to let Soeryanto appear voluntarily in Singapore. Both sides plainly understood that Soeryanto's appearance in Singapore was voluntary; Sundstrand has offered nothing to suggest that its counsel believed, or reasonably could have believed, that Soeryanto was appearing in Singapore pursuant to some form of compulsory process. Sundstrand's counsel assumed (along with plaintiffs' counsel) the risk that Soeryanto would change his mind and decline to appear. Based on the materials presented to the Court, it appears that plaintiffs' counsel honestly believed that the deposition would go forward until the last minute and advised defendants' counsel immediately once he learned otherwise.

In sum, Soeryanto's non-appearance in Singapore had nothing to do with the failure to serve him with compulsory process, as no such process issued by an Indonesian court pursuant to the letters rogatory or otherwise could have compelled him to appear there. The Court therefore denies Sundstrand's motion for costs and attorney's fees.

**4.    Plaintiffs' motion for an order deeming certain fact admitted as a sanction for improper conduct of defendant's counsel at deposition; plaintiffs' motion for an order deeming certain fact admitted as a sanction for improper conduct of defendant's counsel at deposition**

If plaintiffs' evidence is believed, the GPWS (or at least a part of it called a ground proximity warning computer, or GPWC) was manufactured by a Sundstrand division called Sundstrand Data Control. In July 1993, Sundstrand sold that division to Allied Signal, Inc. Allied Signal is now part of Honeywell International, Inc. (we will refer to the entity as "Allied Signal" for purposes of convenience). The Sundstrand - Allied Signal sale agreement included a provision stating that Allied Signal

> shall make . . . available to [Sundstrand] and to its agents and employees all books, records, documents and employees relating to the Business (to the extent they relate to the pre-closing period) as may be reasonably necessary for . . . investigating, preparing for the defense or prosecution of, prosecuting or defending any litigation, proceeding or investigation pending, threatened or anticipated by or against [Sundstrand] . . . which is based upon, arises out of or otherwise is in respect of the Business, or any of the assets or liabilities of the Business . . . .

Pltfs' Mot. to Deem Fact Admitted, Ex. G, § 15.17(I). The agreement only required Allied Signal to maintain pertinent records for six years from the agreement's effective date of November 12, 1993, but Sundstrand's right to obtain records covered by the agreement that were still in existence contained no time limit at all (Sundstrand's contrary argument is an obvious misreading of the agreement's terms).

11

It is undisputed that Allied Signal's obligations under the sale agreement bind Honeywell. It is likewise undisputed that the present matter constitutes litigation within the scope of this clause of the agreement. And there is a reasonable basis to believe that Sundstrand has taken advantage of its rights under the agreement in preparing its defense of this case. Plaintiffs have submitted evidence indicating that pursuant to this agreement, counsel for Sundstrand visited Allied Signal's facility, reviewed documents, and conferred with Allied Signal personnel. (Sundstrand contends that this was done pursuant to a separate agreement, but that contention is unsupported in the papers presented to the Court.)

Despite its right under the sale agreement to obtain relevant Allied Signal records, as well as its apparent exercise of that right for its own purposes, when Sundstrand received document requests from plaintiffs in this case -- which, under Fed. R. Civ. P. 34(a), required Sundstrand to produce responsive documents in its possession, custody, *or control* – it declined to produce any of its former division's records that were held by Allied Signal. By way of example, plaintiffs served a request for "[a]ll documents in the possession, custody or control of defendant ... concerning: a. The subject air crash; ... c. The investigation of the subject air crash; ... g. The manufacture and sale by defendant of any Ground Proximity Warning Device or System to Air Bus Industries, Inc.; h. The installation of a Ground Proximity Warning Device or System on the subject aircraft ...." *See* Dfdt's Resp. to Pltfs' Mot. to Deem Fact Admitted, Ex. E, pp. 1-2. Sundstrand gave the following response, which is best characterized as a non-answer:

> No specific facts surrounding the accident referenced in plaintiff's [sic] complaint have been made available pursuant to the subpoena issued to Garuda and Airbus. Furthermore, upon information and belief, no official report has been released by the Indonesian government or any other investigative bodies. Plaintiffs' attorneys and Defendant's attorneys combined may develop this information as the

discovery recently initialized by plaintiffs or follow up discovery and investigation by defendant progresses. *With respect to subparts (f) through (j), as you know, Allied Signal (now Honeywell) bought the division of Sundstrand (now Hamilton Sundstrand) that produced GPWS products long ago and took over the offices, employees, and relevant documents, etc. That entity has produced documents pursuant to subpoena to both parties and we would refer you to those documents and that entity for the answers you seek.* In addition, we have previously provided you with approximately 30-35 addresses for persons who may have such knowledge or information.

*Id.,* pp. 2-3 (emphasis added). In short, Sundstrand refused to produce to plaintiffs the Allied Signal records that it had an unfettered right to obtain under the sale agreement.

When Sundstrand directed plaintiffs to Allied Signal for the information they sought, plaintiffs elected not to raise the dispute for the Court's determination at that time. Evidently assuming that they would get everything they sought from Allied Signal, they served that entity with a subpoena for records in July 1999, at an early stage of the case. Allied Signal produced a number of documents and represented, either expressly or implicitly, that it had complied in full with the subpoena. In November 2001, however, Allied Signal produced additional documents which it said it had inadvertently failed to produce in its earlier response. These included records documenting the sale of a GPWS (or perhaps a GPWC), bearing serial number 2689, to a French entity that, it appears, was involved in the manufacture of the crashed aircraft. Sundstrand had not produced these documents in response to plaintiffs' requests.

On November 15, 2002, plaintiffs took the deposition of Allied Signal / Honeywell employee Debbie Pederslie. She was produced pursuant to a Rule 30(b)(6) notice of deposition that asked Allied Signal to produce a witness with knowledge of its collection and production of documents. The deposition was taken after fact discovery was closed, though it had been noticed before the cutoff date. At the deposition, Allied Signal produced two new documents which

13

neither it nor Sundstrand had previously produced and which, plaintiffs contend, tend to show that a GPWS or GPWC manufactured by Sundstrand was on board the crashed aircraft. These include an e-mail from Michael Phang, an Allied Signal field representative in Singapore, dated three days after the crash. The e-mail reflects that Phang is responding to a request from an Allied / Honeywell manager in the United States who was seeking information regarding "[w]hat products from CAS were on board" the crashed aircraft. (The parties have not identified what "CAS" means, but in context it appears to have something to do with Allied Signal's operations; Phang's e-mail uses the term "ASCAS".) Phang replies with "information on crashed aircraft" and appears to state that the ASCAS equipment on board includes "GPWC s/n 2689." Pltfs' Mot. to Deem Fact Admitted, Ex. K.

By the time plaintiffs obtained the Phang e-mail, it was too late for them to seek to depose Phang or even to request from Allied Signal further documents or information via deposition that might assist in illuminating the matter. Moreover, as explained below, at Pederslie's deposition, plaintiffs were stymied by Sundstrand's counsel in their effort to lay the foundation for admission of the Phang e-mail and certain other documents as business records under Federal Rule of Evidence 803(6). Based on Sundstrand's non-production of the Allied Signal records, plaintiff now seek, as a sanction for failure to make discovery, an order deeming to be admitted the fact that a GPWS made by Sundstrand was installed and operating on the crashed aircraft.

Sundstrand argues that Allied is responsible for the tardy production of these records, and that may well be true in a technical sense: Allied was obligated to produce records pursuant to a subpoena, and it did not produce the records in question until two to three years too late. But in

the final analysis, it is Sundstrand that bears the primary responsibility for the non-production of these records. Sundstrand had no proper basis to refuse to produce or identify the Allied Signal records when it received plaintiffs' discovery requests. By virtue of its virtually unfettered contractual right of access to the records of its former division from the division's purchaser, Sundstrand unquestionably had "control" over those records and thus was required under Rule 34(a) to produce them when requested by plaintiffs. "Control" for purposes of Rule 34(a) means includes "the legal right to obtain the documents requested upon demand." *Searock v. Stripling,* 736 F.2d 650, 653 (11th Cir. 1984). *See also, e.g., In re Bankers Trust Co.,* 61 F.3d 465, 469 (6th Cir. 1995); *Gerling International Insurance Co. v. Commissioner of Internal Revenue,* 839 F.2d 131, 140 (3d Cir. 1988); *Prokosch v. Catalina Lighting, Inc.,* 193 F.R.D. 633, 636 (D. Minn. 2000); *Alexander v. FBI,* 194 F.R.D. 299, 301 (D.D.C. 2000). *See generally* 8A C. Wright, A. Miller & R. Marcus, Federal Practice and Procedure § 2210 at 397 (1994 & Supp. 2003). Sundstrand violated its discovery obligations under Rule 34(a) when it deflected plaintiffs' requests and referred plaintiffs to Allied Signal.

In light of Sundstrand's defense that its GPWS was not on board the aircraft, the Phang memo is the rough equivalent of a smoking gun – assuming, that is, that a foundation could be laid for its admission under Fed. R. Evid. 803(6) as a business record of Allied. But it was exactly at that point that plaintiffs were stymied. Because the Phang memo was not produced until after discovery closed, plaintiffs lacked the opportunity to locate Phang and seek to depose him, or to seek to lay the foundation for the document's admissibility in some other manner. But for reasons we will discuss momentarily, plaintiffs were likewise hampered at Pederslie's deposition from authenticating the documents, due to the actions of Sundstrand's counsel.

It is reasonable to believe that if Sundstrand had not improperly refused plaintiffs' request, plaintiffs would have had access to the pertinent Allied Signal records early enough to enable them to lay a proper foundation for their admissibility. Though plaintiffs' counsel may be justifiably criticized for deferring significant discovery (e.g., Pederslie's deposition) until the eleventh hour, it is reasonable to believe that if plaintiffs had received the Phang document in timely fashion, they would have been able to follow up in an appropriate manner prior to the close of discovery.

As noted earlier, the Pederslie deposition was taken pursuant to a Rule 30(b)(6) notice asking Allied Signal to produce a witness with knowledge regarding its production of records. The deposition was taken by a younger, less experienced attorney employed by the law firm representing the plaintiffs. It was defended by primary trial counsel for Sundstrand, a much more experienced attorney. At the deposition, plaintiffs' counsel attempted, at times somewhat ineptly, to lay a business record foundation for the documents that plaintiffs had obtained from Allied Signal. The effort largely proved unsuccessful.

The Court finds that plaintiffs' counsel's lack of success at the deposition was attributable in large part to improper conduct by Sundstrand's attorney. The Federal Rules of Civil Procedure unambiguously prohibit "speaking" objections by counsel at a deposition: "Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner." Fed. R. Civ. P. 30(d)(1). Sundstrand's counsel repeatedly violated this Rule during Pederslie's deposition, even after it was called to his attention that he was making improper objections. The following passages illustrate this:

Q:    Were the documents that you collected and produced to the attorneys for

Honeywell in response to the subpoenas kept by Sundstrand, Allied Signal or Honeywell now in the course of its regularly conducted business activity?

...

Dfdt. Atty.:    I'm going to object to that question, because it's a compound question. It asks "kept" and about the course in which and the basis upon which they're kept.

And the form is objectionable, because it's asking about all of the documents, of which I believe there's a thousand or more, and I believe that it invites dangerous testimony because it should discuss them one by one or group by group. Therefore, it is improper. It can easily be remedied by saying which documents.

Pltf. Atty.:    I don't understand.

Dfdt. Atty.:    Which of the thousand are you referring to?

Pltf. Atty.:    I'm referring to all the documents she gathered in her scope as the person who is gathering the documents for the attorneys.

Dfdt. Atty.:    In other words, if this department has them, they kept them or they didn't keep them; if this department has them, if they kept them or they didn't?

I object additionally on lack of foundation, because there's no establishing that this witness would have knowledge of the basis upon which each department kept the documents, if indeed they did. It's foundation.

Pltf. Atty.:    Well, can you just keep it – I mean, you've been – I think I've been pretty good about this, too, *but if you have an objection, I mean just tell me foundation or tell me whatever it is.*

Dfdt. Atty.:    No, I don't think that's exactly the correct way to do it.

Pltf. Atty.:    *You know better than to do speaking objections, Bill. Come on.*

Dfdt. Atty.:    I'm not speaking to anyone. I'm saying what the basis of the foundation is and, indeed, the way in which I've been making objections was to not help the witness but to help you.

Pltf. Atty.:    That's okay. I appreciate that.

Pederslie Dep. 28-30 (emphasis added). Once she was permitted to answer the question, the

witness got the message:

> Q:     Were the documents which you collected and produced to the Honeywell
>        attorneys in response to the subpoena and the rider kept by what is now
>        Honeywell in the course of its regularly conducted business activity?
>
> Dfdt. Atty.:    Same objection.
>
> Honeywell Atty.:     You can answer that.
>
> A:     There were various categories of records gathered and produced. Each category
>        has its own unique requirements for whether or not it's a company record and
>        whether or not it's to be retained and for how long.
>
>        I think the best way that I can answer the question is whether they were company
>        records in some fashion. I wouldn't say business records, but company records.

*Id.* 30-31. Plaintiff's attorney tried again, but he was again stymied by an improper objection by

Sundstrand's attorney:

> Q:      Were they company records that were kept in the ordinary course of business?
>
> Dfdt. Atty.:   I thought that was asked and answered.
>
> Pltf. Atty.:   It's a different question.
>
> Dfdt. Atty.:   Can I hear that again?
>
> Pltf. Atty.:   Because she corrected me on the fact that she said they're corporate
>                records, not business records. So I'm changing the question to reflect
>                corporate records, like she said.
>
> Dfdt. Atty.:   Whether they're corporate or they're business, you just asked her whether
>                they were kept in the ordinary course already and you just asked it again.
>
> Pltf. Atty.:   I'm sorry.
>
> Dfdt. Atty.:   I mean, if you are withdrawing it, I won't hear it again. If you are leaving
>                it, I'm going to have to hear it. If you are withdrawing it, I won't.

| | |
|---|---|
| Pltf. Atty.: | Okay, then you'll have to hear it then. |
| Dfdt. Atty.: | Okay, let me hear that again. |
| | (Record read.) |
| Dfdt. Atty.: | Same objection as to when this question was posed the last time, which is that the form of the question is improper, because it seeks to ask about thousands of pages of documents. |
| | To ask a witness for which no foundation has been laid that she has personal knowledge of the basis upon which they were kept about all of the documents, though she has testified already – |
| Pltf. Atty.: | *Bill, you're testifying for her, and we can't keep having this on the record. You can't have a speaking objection like that.* |
| | I've been very tolerant of it, and I'm trying to be tolerant, and the witness gave me a perfectly acceptable response to my question – |
| Dfdt. Atty.: | You asked the same question again. |
| Pltf. Atty.: | No, I didn't. I was clarifying it. She's a smart enough woman that she's going to know – |
| Dfdt. Atty.: | It has nothing to do with her. It has to do with what you are doing, and what you are doing is drawing an objection. |
| | You can raise your voice if you like, but I'm still going to do it. I'm going to finish this when you're done. |
| | So I'm going to make the objection again and start from the top when you're done. If you are going to keep interrupting me, I'm going to keep doing it that way. |
| Pltf. Atty.: | Okay. |
| Dfdt. Atty.: | So I'm going to take it from the top again. |
| | I object to the question as posed. It is improper. It is the same question that was posed before that was already answered. |
| | Additionally, the form of the question is bad, because it asks about |

thousands of pages of documents without any foundation, that this witness has personal knowledge about the contents of those documents, where they came from and the basis upon which they were kept, whether that was in the ordinary course or not.

If you want to ask about document by document, I think you can do that, but it's improper to do thousands of pages in this way.

Pltf. Atty.: *Just for the record, I am reserving my right to redepose Ms. Pederslie at a later date, given the abuse of process of the speaking objections that we've had thus far and, hopefully, won't continue when we move along.*

*Id.* 31-34 (emphasis added). Again, Pederslie got the message from Sundstrand's counsel:

Q: You can answer the question.

A: Again, there are many different categories of records. They are company records, not necessarily business records, and each category of record has different, if you will, requirements as to whether or not they should be maintained. And so I can't answer to all documents produced, because they are all different.

Further, even though I may have gathered or produced the documents, I didn't necessarily see or read each and every document. So I wouldn't know on some of them.

*Id.* 34. Plaintiff's counsel continued in his effort to lay a foundation for the records' admissibility, but the obstructive efforts of Sundstrand's counsel also continued:

Q: Now, looking at the rider [to the subpoena] in front of me, would that assist you in telling me what categories that you don't feel you are familiar enough with to say if the records were kept in the ordinary course of business?

Dfdt. Atty.: I thought she just testified to something other than kept in the ordinary course of business.

Witness: I did.

Dfdt. Atty.: You just assumed that her answer was for the ordinary course of business. That's not the answer she just gave. So I object to the question based on the form.

Q: Okay. You can answer.

| Dfdt. Atty.: | I would like to ask you to withdraw it, because I think it's an improper question. It's assuming testimony that doesn't exist. |
|---|---|
| Honeywell Atty.: | I think it misstates her prior testimony. |
| Pltf. Atty.: | I'm not withdrawing it. |
| Dfdt. Atty.: | Okay. I'm going to counsel the witness to be careful with this question. You may want to clarify what he – |
| A: | Could you ask it one more time please? |

*Id.* 37-38.

By relentlessly placing roadblocks in the path of plaintiffs' counsel, Sundstrand's counsel effectively diverted the deposition off course, into a discussion of company record retention procedures, which have relatively little to do with laying a business record foundation under Rule 803(6). The tactic was effective. Plaintiffs' counsel left the deposition with little that could benefit the plaintiffs.

Sundstrand's improper non-production of the Allied Signal records and the improper tactics of its counsel at Pederslie's deposition had the combined effect of preventing plaintiffs from laying a business record foundation for the Allied Signal records prior to the close of fact discovery. The deposition was a crucial one for both sides, as it represented plaintiffs' attempt to authenticate and lay the foundation for records that struck at the core of what appears to be, or at least to was up to that point, Sundstrand's primary defense – that plaintiffs could not prove that a Sundstrand-made device was on board the crashed aircraft. Sundstrand's attorney intervened at crucial junctures during the deposition with improper speaking objections that, in context, quite clearly appear to have been designed not (as Sundstrand argues) to help its Sundstrand's opponent but rather to convey to the Allied Signal / Honeywell witness (who, it should be

recalled, had indicated that Sundstrand's attorney was effectively acting as her attorney too) not to provide plaintiffs' attorney with answers that would assist in his effort.

The Court rejects Sundstrand's argument that its attorney was simply trying to assist plaintiff's attorney at the deposition. Sundstrand's counsel did "help" by laying a foundation for a couple of documents -- which to the Court appear to be relatively innocuous standing alone -- but by that time the damage had been done. It strains credulity to believe, and after reviewing the transcript deposition several times the Court does not believe, that Sundstrand's counsel was simply trying to help out a less-skilled opponent. If nothing else, that would be utterly inconsistent with what the Court has observed of both sides' counsel in this case over the past nearly four years.

As the Court has noted, the effort of plaintiffs' attorney was at times inept, and we have considered the possibility that plaintiffs' inability to obtain responsive and meaningful answers to key questions put to Pederslie was the result of ineptitude rather than obstruction. The Court concludes that such is not the case. Rather, the relative lack of skill of plaintiffs' attorney served as a factor that allowed Sundstrand's obstructive efforts to succeed.

With regard to both the Allied Signal records and the Pederslie deposition, plaintiffs' counsel rightly may be criticized for not being aggressive enough or astute enough to realize soon enough that they were being given the run-around. But that simply facilitated Sundstrand's erection of unfair and unjustified obstacles to the plaintiffs' discovery of relevant and material evidence. To use an imperfect analogy, what is sometimes referred to in baseball as the "hidden ball trick" works only when the opposing baserunner is careless or inattentive.

It is often said that litigation is, or at least should be, a search for the truth. But in

practical terms it often ends up as a search for what a party can prove or disprove long after the fact. But that only makes it all the more important for each side to have the access to evidence that the Rules of Civil Procedure guarantee. That access was stymied in this case.

Plaintiffs have asked the Court to deem it established that Sundstrand's device was on the aircraft. That is an available sanction in the circumstances presented. Because Sundstrand did not violate a court order regarding discovery, the Court's authority to order sanctions is narrowed somewhat.[2] *Compare* Fed. R. Civ. P. 37(b) *with id.* 37(c) & (d). But Sundstrand's failure to produce the Allied Signal records amounted to a failure to make a response to a Rule 34 request for production, and thus the Court is permitted to "make such orders in regard to the failure as are just," including entering an order regarding designated facts to be established, barring the non-disclosing party from supporting or opposing certain claims, striking pleadings or parts thereof, or entering a judgment by default. *See* Fed. R. Civ. P. 37(d).

A district court is not required to impose the least drastic sanction for a discovery violation, but we are required to impose a sanction that is proportionate to the party's violation. *See, e.g., Johnson v. J.B. Hunt Transport, Inc.,* 280 F.3d 1125, 1132 (7th Cir. 2002); *Melendez v. Illinois Bell Telephone Co.,* 79 F.3d 661, 673 (7th Cir. 1996). If plaintiffs had not been stymied by Sundstrand from obtaining the discovery they sought and from questioning Pederslie, what they would have ended up with if all had gone well for them was a foundation for the admissibility of the Allied Signal documents, not an admission by Sundstrand that its device was on the aircraft. At this juncture we obviously have no way of knowing what would have

---

[2] Sundstrand has not argued that the sanctions requested by plaintiffs are unavailable under the law and thus has waived the point. We address this issue only to make it clear that we have considered possible limitations on our authority.

. happened if Sundstrand had produced the Allied Signal records as the Federal Rules required, or if its counsel had not acted in the way he did at the Pederslie deposition. But when one side impedes the other side's access to relevant evidence, as Sundstrand has done here, it must lie in the bed it has made. Because critical Allied Signal documents surfaced, and plaintiffs' deposition of Pederslie was impeded, at the end of discovery just before trial, the damage cannot fairly be undone simply by sending plaintiffs back to the drawing board to retake the deposition and conduct the additional discovery (some if it potentially overseas) that would be needed to permit them to attempt to lay the foundation for admitting the Allied Signal records. To do so would require a significant continuance of the impending trial, which the Court is unwilling to force upon the plaintiffs, or the system of justice, at this late stage.

A good case can be made for precluding Sundstrand from disputing that its GPWS / GPWC was on the aircraft; a sanction that simply gives the requesting party what it was prevented from getting (here, a foundation to admit the Allied Signal records in evidence) arguably under-deters violations of the rules. But the Court has chosen to exercise its discretion in this regard to limit the substantive sanction to the matter that the plaintiffs were actually attempting to achieve via the Allied Signal-related discovery. Specifically, the Court precludes Sundstrand from opposing the admission in evidence of the Allied Signal documents in question: the Phang e-mail; Pederslie's January 11, 1999 e-mail; the records regarding the sale of the device to the French entity; and any other Allied Signal records as to which that plaintiffs can show they were hindered from laying a foundation for admissibility.

In addition, the Court awards plaintiffs the reasonable attorney's fees they incurred in connection with subpoenaing Allied Signal and obtaining its records (a step they should not have

had to take); one-half of the reasonable attorney's fees and expenses they incurred in taking the Pederslie deposition; and the reasonable attorney's fees they incurred in the making and briefing of the two motions at issue. *See* Fed. R. Civ. P. 37(a)(4)(A) & 37(d). Plaintiffs are directed to submit a schedule of the recoverable fees and expenses within seven days of this order, and defendant is directed to respond within seven days thereafter.

## Conclusion

For the reasons stated above, the Court grants defendant's motion for summary judgment as to plaintiffs' strict liability claims (Case No. 99 C 6946, Counts 1 & 2; Case No. 99 C 6944, Counts 1 & 2 of first amended complaint) [docket #196]. The Court grants plaintiffs' motion for summary judgment as to affirmative defenses four through fourteen but otherwise denies that motion [#191]. The Court grants in part plaintiffs' motion for an order deeming certain fact admitted as a sanction for improper conduct of defendant's counsel at deposition and their motion for an order deeming certain fact admitted as a sanction for improper conduct of defendant's counsel at deposition as stated above [#265, 266]. The Court denies defendant's motion for costs and attorney's fees pursuant to Rule 30(g) [#204]. On an unrelated matter, the Court advises the parties that if translators are needed for purposes of the trial, the parties must make the arrangements for this and are expected to cooperate in securing translators acceptable to both sides.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 18, 2003